**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CATALINA MESSINA, KATHERINE DIEKER, CHRISTOPHER JACOB, ANNA ZIMBERG, and ISABELLA WALZ,<br><br>  Plaintiffs,<br><br>  v.<br><br>THE COLLEGE OF NEW JERSEY and THE BOARD OF TRUSTEES OF THE COLLEGE OF NEW JERSEY,<br><br>  Defendants. | Hon. Zahid N. Quraishi, U.S.D.J.<br><br>CIVIL ACTION NO. 3:21-CV-17576-ZNQ-DEA<br><br>**CIVIL ACTION**<br>**(ELECTRONICALLY FILED)**<br><br>**Brief Due: October 4, 2021** |

**BRIEF IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER**

Daniel M. Vannella
*Assistant Attorney General*
  Of Counsel and on the Brief

Francis Baker
Willis Doerr
Carlene Dooley
Phoenix Meyers
*Deputy Attorneys General*
  On the Brief

ANDREW J. BRUCK
ACTING ATTORNEY GENERAL
OF NEW JERSEY
R.J. Hughes Justice Complex
25 Market Street
P.O. Box 112
Trenton, New Jersey 08625
*Attorney for Defendants*

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ..........................................................................1

COUNTERSTATEMENT OF FACTS AND PROCEDURAL HISTORY ............3

    A.    COVID 19's Spread And Devastating Impact .....................................3

    B.    Advent Of COVID-19 Vaccines ..........................................................4

    C.    Importance Of Vaccines And Other Measures To Control
        COVID-19 Spread In College Settings ....................................................6

    D.    TCNJ's Vaccination/Testing Policy For Fall 2021 Semester ...............9

    E.    Plaintiffs' Complaint And Motion For Injunctive Relief....................12

STANDARD FOR EMERENCY INJUCTIVE RELIEF........................................15

ARGUMENT

    I.    PLAINTIFFS WILL NOT SUCCEED ON THEIR MERITS...........16

        A.    TCNJ Has Sovereign Immunity And Is Not Subject To
            Plaintiffs' Suit ...........................................................................17

        B.    TCNJ's Policy Does Not Violate The Constitution..................20

            1.  *The Challenge To The Vaccine Requirement* ....................21

            2.  *Claims Against Testing And Social Distancing Rules* .......28

            3.  *The Equal Protection And Fourth Amendment Claims* .....31

    II.    THE REMAINING FACTORS MILITATE AGAINST
        GRANTING EMERGENCY INJECTIVE RELIEF. ...........................35

CONCLUSION ...................................................................................................40

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acierno v. New Castle Cty.*,
  40 F.3d 645 (3d Cir. 1994) ..................................................................37

*Adams v. Freedom Forge Corp.*,
  204 F.3d 475 (3d Cir. 2000) ................................................................15

*Ariz. Christian Sc. Tuition Org. v. Winn*,
  563 U.S. 125 (2011)..............................................................................21

*Aviles v. Blasio*,
  2021 WL 796033 (S.D.N.Y. Mar. 2, 2021).........................................34

*Bechade v. Baker*,
  No. 20-11122, 2020 WL 5665554 (D. Mass. Sept. 23, 2020)............22

*Benn v. First Judicial Dist. of Pa.*,
  426 F.3d 233 (3d Cir. 2005) ................................................................18

*Blanciak v. Allegheny Ludlum Corp.*,
  77 F.3d 690 (3d Cir. 1995) ..................................................................17

*Cassell v. Snyders*,
  458 F. Supp. 3d 981 (N.D. Ill. 2020)...................................................38

*Children's Health Defense v. Rutgers*,
  No. 21-15333, 2021 WL 4398743 (D.N.J. Sept. 27, 2021)........................*passim*

*Citibnk, N.A. v. Citytrust*,
  756 F.2d 273 (2d Cir. 1985) ................................................................37

*Conestoga Wood Specialties Corp. v. Sec. of U.S. Dep't of Health &*
  *Human Servs.*,
  No. 13-144, 2013 WL 1277419 (3d Cir. Feb. 8, 2013) .......................15

*Cty. of Butler v. Gov. of Pa.*,
  8 F.4th 226 (3d Cir. 2021) ...................................................................29

*Dimeo v. Griffin*,
  943 F.2d 679 (7th Cir. 1991) ................................................................30

*Doris Behr 2012 Irrevocable Trust v. Johnson & Johnson*,
  No. 19-8828, 2019 WL 1519026 (D.N.J. Apr. 8, 2019) ..................................37

*Fitchik v. N.J. Transit Rail Operations, Inc.*,
  873 F.2d 655 (3d Cir. 1989) ................................................................17

*Gonzalez v. N.J. Dep't of Children & Families*,
  No. 14-7932, 2021 WL 2621743 (D.N.J. June 25, 2021) ................................19

*Harris v. Univ. of Mass., Lowell*,
  No. 21-11244, 2021 WL 3848012 (D. Mass. Aug. 27, 2021).....................*passim*

*Jacobson v. Massachusetts*,
  197 U.S. 11 (1905).........................................................................*passim*

*Jones v. Pi Kappa Alpha Int'l Fraternity, Inc.*,
  765 Fed. Appx. 802 (3d Cir. 2019).......................................................18, 19, 20

*Kheriaty v. Regents of the Univ. of Cal.*,
  No. 21-1367, Dkt. 39 (C.D. Cal. Sept. 29, 2021) .................................23, 27, 32

*Klaassen v. Trustees of Ind. Univ.*,
  No. 21-238, 2021 WL 3073926 (N.D. Ind. July 18, 2021) ..............30, 32, 36, 40

*Klaassen v. Trustees of Ind. Univ.*,
  7 F.4th 592 (7th Cir. 2021) .............................................................*passim*

*Kos Pharms. Inc. v. Andrx Corp.*,
  369 F.3d 700 (3d Cir. 2004) ................................................................16

*Lane v. New Jersey*,
  725 F. App'x 185 (3d Cir. 2018) ..........................................................16

*Lanin v. Borough of Tenafly*,
  515 Fed. App'x. 114, 2013 WL 936363 (3d Cir. 2013)..................................37

*Maliandi v. Montclair State Univ.*,
  845 F.3d 77 (3d Cir. 2016) .........................................................17, 18, 19, 20

iii

*Maryland v. King*,
    567 U.S. 1301 (2012) (Roberts, C.J., in chambers)..............................................38

*In re Nickelodeon Consumer Privacy Litig.*,
    827 F.3d 262 (3d Cir. 2016) ...............................................................................21

*Norris v. Stanley*,
    No. 21-756, 2021 WL 3891615 (W.D. Mich. Aug. 31, 2021) .....................23, 30

*Norwegian Cruise Lines Holdings, Ltd. v. Rivkees*,
    No. 21-22492, 2021 WL 3471585 (S.D. Fla. Aug. 8, 2021)..............................32

*Pharmacia Corp. v. Alcon Labs.*,
    201 F. Supp. 2d 335 (D.N.J. 2002).....................................................................36

*Regents of the Univ. of Cal. v. Doe*,
    519 U.S. 425 (1997)............................................................................................17

*Reilly v. Ceridian Corp.*,
    664 F.3d 38 (3d Cir. 2011) .................................................................................21

*Reilly v. City of Harrisburg*,
    858 F.3d 173 (3d Cir. 2017) ...............................................................................16

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
    141 S. Ct. 63 (2020)...........................................................................................26

*Shelton v. City of Springfield*,
    No. 20-3258, 2020 WL 6323935 (W.D. Mo. Oct. 28, 2020) .............................22

*Streight v. Pritzker*,
    No. 21-50339, 2021 WL 4306146 (N.D. Ill. Sept. 22, 2021).....................*passim*

*Tolle v. Northam*,
    No. 20-363, 2020 WL 1955281 (E.D. Va. Apr. 8, 2020)...................................38

*Truck Ctr., Inc. v. Gen'l Motors Corp.*,
    847 F.2d 100 (3d Cir. 1998) ..............................................................................15

*Valdez v. Grisham*,
    No. 21-783, 2021 WL 4145746 (D.N.M. Sept. 13, 2021)..................................32

*Veronia Sch. Dist. 47J v. Acton*,
515 U.S. 646 (1995)..................................................................................34, 35

*W.S. by Sonderman v. Ragsdale*,
No. 21-1560, 2021 WL 2024687 (N.D. Ga. May 12, 2021) .......................38, 40

*Wade v. Univ. of Conn. Bd. of Trustees*,
No. 21-924, 2021 WL 3616035 (D. Conn. Aug. 16, 2021)...............................21

*Washington v. Glucksberg*,
521 U.S. 702 (1997)........................................................................................29

*Will v. Mich. Dep't of State Police*,
491 U.S. 58 (1989)....................................................................................17, 20

*Wreal, LLC v. Amazon.com, Inc.*,
840 F.3d 1244 (11th Cir. 2016) ......................................................................37

## Statutes and Legislation

L. 2021, c. 103 ................................................................................................4

N.J. Stat. Ann. § 18A:61D-1.......................................................................6, 26

N.J. Stat. Ann. §§ 18A:64-1 to -84, 18A:3B-1 to -36.......................................20

## Other Authorities

N.J. Admin. Code § 8:57-6.4 ...........................................................................26

N.J. Admin. Code § 8.57-6.4(c)..........................................................................6

N.J. Admin. Code §§ 8:57-6.5 to 6.9 ..................................................................6

## PRELIMINARY STATEMENT

New Jersey law has long required all higher education students, including students at The College of New Jersey ("TCNJ"), to be vaccinated against certain diseases and to provide proof of vaccination as a condition of continued enrollment. It also includes authority to expand these requirements to address new viral threats. COVID-19 is a highly contagious, deadly disease. Over the past 19 months, it has claimed the lives of 700,000 Americans, including more than 27,000 New Jerseyans. And it has required New Jersey to take unprecedented measures to protect the health of its residents, measures that would not have countenanced absent such life-or-death consequences. Although the advent of effective, FDA-authorized vaccines in early 2021 helped significantly reduce the number of COVID-19 hospitalizations and cases, the virus, in particular the Delta Variant, continues to pose serious threats to public health. And the risks of serious illness or death, and transmission of the virus to others, are higher among the unvaccinated.

TCNJ, echoing the latest medical and scientific evidence and guidance of the Centers for Disease Control and Prevention ("CDC") and the American College Health Association ("ACHA"), advised its students months ago that it would require proof of full COVID-19 vaccination for the Fall 2021 semester. Both medical and religious exemptions to this requirement are available. Those who obtain an exemption are subject to free regular testing, as well as certain specific social-

1

distancing rules to address the additional COVID-19 threats connected with those who are unvaccinated.

Plaintiffs are all TCNJ students who have obtained exemptions, but nevertheless challenge the school's policy. Although Plaintiffs demand that this federal court overturn the policy, they have fallen far short of the standard necessary to obtain an emergency injunction. For one, Defendants enjoy sovereign immunity from suit and are not subject to suit under the federal civil rights act, and ultimately Plaintiffs' Complaint must be dismissed altogether.

Even putting aside this threshold fatal defect to Plaintiffs' claims, the crux of their argument has been rejected many federal courts—including by this very Court—reviewing similar challenges. Consistent with Supreme Court precedent spanning more than a century, a COVID-19 vaccine for a college's student body neither infringes on due process nor violates equal protection. Indeed, this would be true even had TCNJ obligated Plaintiffs to be vaccinated in order to maintain enrollment—though its actual policy, again, does not even go that far.

Even beyond the (lack of) merits, the equitable factors foreclose relief because an injunction against the school masking requirement would undermine the State's efforts to contain the spread of COVID-19. Few requests for emergency relief present risks this immediate and stark, against such profound shortcomings in the merits of Plaintiffs' constitutional claims. This Court must deny the invitation to

2

force TCNJ to allow the campus community to be further exposed to the dangers presented by this unprecedented virus. A TRO is wholly unwarranted.

## **COUNTERSTATEMENT OF FACTS AND PROCEDURAL HISTORY**[1]

### A.    **COVID-19's Spread And Devastating Impact.**

COVID-19 presents a public health emergency unprecedented in modern times. Its discovery and spread is well-documented. *See* Exs. 1-3. At present, over 234 million cases have been confirmed worldwide, with more than 4.8 million lives lost. *See* Ex. 4. In the United States, about 43 million cases have been confirmed and 700,000 lives lost. *See* Ex. 5. In New Jersey, there have been over 1,000,000 confirmed cases and over 27,000 confirmed and probable deaths. *See* Ex. 7.

On March 25, 2020, the President declared New Jersey a "major disaster area." Ex. 6. As of the filing of this brief, Governor Phil Murphy—in consultation with the Commissioner of Health—declared a public health emergency and a state of emergency existed on March 9, 2020, *see* EO 103, and subsequently adopted a series of executive orders to limit the spread of COVID-19 in New Jersey.[2] By June 2020, significant improvements in COVID-19 metrics and the development and rollout of effective vaccines led the Legislature to enact, and the Governor to sign

---

[1] Combined for the Court's convenience.

[2] All of the Governor's executive orders are publicly available in a databank maintained on the State's website. *See* https://nj.gov/infobank/eo/056murphy/ (last visited Oct. 4, 2021).

into into law, legislation providing for the termination of the public health emergency, but expressly authorizing the Governor to retain certain executive powers related to the COVID-19 response. *See* L. 2021, c. 103. That law exempted certain executive orders from expiration and allows state officials to issue policies related to, among other things, the "implementation of any applicable recommendations of the [CDC] to prevent or limit the transmission of COVID-19, including in specific settings." *Id.* at ¶ 5.

In the meantime, the virus itself is ever-changing, with new mutations or "variants," presenting new challenges. *See* Ex. 8. The predominant strain in the United States is now the B.1.617.2 "Delta Variant," which is approximately twice as contagious as previous variants and more likely to result in hospitalization. Exs. 9-13. Growing data also suggests it causes more severe illness than previous strains in unvaccinated persons. Exs. 9; 11-12. In the past month, it accounted for more than 95% of new COVID-19 infections, and more than 98% in the past week, nationwide. *See* Exs. 5, 15. In recent weeks, it has accounted for 99% of new cases in New Jersey. Ex. 16. Unvaccinated people remain at greatest risk, since they are more likely to contract the virus and to spread it to others. *See, e.g.*, Ex. 9.

**B.     Advent Of COVID-19 Vaccines.**

Since December 2020, three vaccines against COVID-19 have received Emergency Use Authorization ("EUA") or final approval from the Food and Drug

4

Administration (FDA): the two-dose Moderna vaccine, the two-dose Pfizer-BioNTech vaccine, and the single-dose Johnson & Johnson (Janssen) vaccine. Exs. 17-19. Clinical data demonstrate that all three vaccines are safe and effective at reducing illness from COVID-19. *Id.*[3] To date, approximately 64.4% of the total population of New Jersey has been fully vaccinated. Ex. 22.

Studies have shown that the approved COVID-19 vaccinations provide more robust protection from COVID-19 reinfection than natural immunity alone. According to a recent study, unvaccinated people are 2.34 times more likely to get COVID-19 again, compared to fully vaccinated people. Ex. 23. Indeed, not everyone who is infected with COVID-19 develops a natural immunity to the virus. In a recent study of individuals who contracted COVID-19, a third (36%) of individuals had not developed SARS-CoV-2 antibodies, and thus had no natural immunity to the virus whatsoever. Ex. 24. And natural immunity can decay within 90 days, while data

---

[3] Contrary to a misperception circulated in the fringes of social media, which dominates Plaintiffs' arguments in their Motion brief, the FDA-authorized COVID-19 vaccines are, in fact, vaccines, and *not* "gene therapy." As the FDA explains, "Gene therapy is a technique that *modifies a person's genes* to treat or cure disease." *See* Ex. 55. The COVID vaccines do not do that. *See, e.g.*, Ex. 20 (explaining that vaccines with mRNA technology would need to have a nuclear access signal—which they do not have—in order to cross cells' nuclear membrane and alter one's genes); Ex. 21 (same). Plaintiffs offer zero support for their assertions. Notably, their citation to Moderna's S-1 statement is from 2018, long before the advent of COVID and the vaccine. *See* Dkt. 1, ¶ 34; Dkt. 1-5.

5

demonstrates that all three approved vaccines provide strong protection for at least six months. Exs. 25-27; *see also* Ex. 28.

### C. Importance Of Vaccines And Other Measures To Control COVID-19 Spread In College Settings.

Under N.J. Stat. Ann. § 18A:61D-1, New Jersey law requires institutions of higher education in the state to require students to be vaccinated against certain diseases and to provide proof of vaccination as a condition of admission or continued enrollment. Regulations from the New Jersey Department of Health require specific vaccinations. N.J. Admin. Code §§ 8:57-6.5 to 6.9. Another, N.J. Admin. Code § 8.57-6.4(c), gives each institution "authority … to establish additional requirements for student immunizations and documentation that such institution shall determine appropriate and which is recommended by" the federal Advisory Committee on Immunization Practices ("ACIP"). Each of the three COVID-19 vaccines have been recommended by ACIP. *See* Ex. 29.

Colleges and universities accommodate large numbers of people living in close proximity on campus and participating in a variety of social, educational, and recreational activities indoors, which poses a particularly acute risk of COVID-19 transmission. Ex. 30; *see* Ex. 31. To protect students, many colleges and universities around the country had to transition to remote learning for most of the 2020-21 academic year. *See, e.g.*, Ex. 33. Even still, as of May 26, 2021, more than 700,000 COVID-19 cases have been linked to American colleges and universities. Ex. 32.

6

To help colleges and universities facilitate the safe return to in-person learning this fall while negotiating the still-present COVID-19 threat, the CDC has issued "Guidance for Institutions of Higher Education (IHEs)." Ex. 34. In that guidance, the CDC emphasizes that "[v]accination is the leading prevention strategy to protect individuals from COVID-19 disease and end the COVID-19 pandemic." *Id.*; *see also* Ex. 35 ("Vaccination coverage is the most powerful tool available to residential college administrators seeking to achieve a safe return to pre-pandemic operations this fall."). The ACHA likewise recommends COVID-19 vaccination requirements for all on-campus students for the fall semester, subject to the college's normal exemption practices, including exemptions for medical contraindications. Ex. 36.

At colleges and universities where not all students are fully vaccinated,[4] the CDC recommends "implementation of a robust, frequent SARS-CoV-2 screening testing program with high participation from the unvaccinated campus population." *Id.* Specifically, the CDC advises that entry screening at the start of each term combined with serial screening testing can help prevent or slow the spread of COVID-19. Ex. 30; see Ex. 39. Similarly, the ACHA recommends that weekly asymptomatic testing focus on unvaccinated students, faculty, and staff, particularly

---

[4] Because vaccinated individuals have increased immunity against COVID-19 and pose less of a transmission risk to others, the CDC has advised that only campuses where students and staff are *fully* vaccinated need not be subject to the same prevention interventions. Exs. 34, 37.

those living in a congregate setting. Ex. 40. Meanwhile, both the CDC and ACHA recommend that people who are *not* fully vaccinated continue to practice physical distancing. *See, e.g.*, *id.*; Ex. 37; Ex. 38 (concluding that 96% of infections on college campuses could be prevented with masking, routine screening testing, and extensive physical distancing). The CDC also recommends colleges consider designating fully vaccinated dorms or housing students who are not fully vaccinated in single rooms instead of shared rooms when feasible. *Id.* Consistent with these recommendations, hundreds of colleges and universities around the country have adopted policies requiring students to be vaccinated in order to attend in-person classes and live on campus. Ex. 32. Most of these institutions are permitting medical, religious and other exemptions on a case-by-case basis. *Id.*

Conversely, as a sobering reminder of the persistent threat faced by COVID-19 on college campuses, as well as the critical importance of vigilantly implementing and enforcing the recommendations of public health officials, multiple universities already have needed to revert to remote learning due to outbreaks following students' return to campus this fall. After the first week of classes, LaSalle University was forced to temporarily transition back to virtual learning after reporting 43 positive cases of COVID-19. Ex. 41. Connecticut College also had to shift to remote classes following a COVID-19 outbreak among its students. Ex. 42. Harvard Business School shut down in-person instruction for all first-year MBA

8

students and some second-year students until October 3, amid a spike in positive coronavirus cases. Ex. 43.[5]

### D. TCNJ's Vaccination/Testing Policy For Fall 2021 Semester.[6]

On May 7, 2021, TCNJ announced that all students enrolled for the Fall 2021 semester would be required to be "fully vaccinated with a COVID-19 vaccine authorized by the [FDA] or authorized for emergency use by the World Health Organization (WHO)." *See* TCNJ, "COVID-19 Vaccination Requirement," https://health.tcnj.edu/covid-19-vaccination/ (last visited Oct. 4, 2021); TCNJ, Office of the President, "Fall 2021: Back Together Again," https://president.tcnj.edu/2021/05/07/back-together-again/ (last visited Oct. 4, 2021). This requirement was implemented to help ensure the safe return of in-person learning for the Fall 2021 semester, as well "to minimize outbreaks of COVID-19 within the TCNJ community, to prevent or reduce the risk of transmission of

---

[5] Other examples abound. *See* Ex. 44 (at Liberty University in Virginia, where over 1,000 positive cases have been identified since classes began on August 23, classes had to revert to virtual learning until September 10); Ex. 45 (Rice University in Houston shifted classes online for first two weeks of semester because of high COVID numbers); Ex. 46 (University of Dallas moved to remote learning from September 3 through September 13 after surge in COVID-19 cases on campus).

[6] A non-exhaustive list of various TCNJ communications to its students and employees regarding COVID-19 policies for the Fall 2021 semester can be found at https://fall2021.tcnj.edu/message-archive/.

9

COVID-19, and to promote the public health of the community." TCNJ, "COVID-19 Vaccination Requirement," *supra*.

The policy permits students to apply for an exemption from the vaccination requirement under certain limited circumstances. *Id.* Students whose entire course of study is exclusively web-based or who are enrolled in a fully online program may be exempted. *Id.* And any student may be considered for exemption from the COVID-19 vaccine requirement if they have a medical contraindication for COVID-19 vaccination. *Id.* Conditions qualifying as valid medical contraindications to vaccine administration are those set forth by the CDC. *Id.* Students seeking a medical exemption must provide a written statement from their healthcare provider stating that a specific immunization is medically contraindicated and giving the reasons for and duration of the contraindication. *Id.* Students also may request an exemption based on their sincerely held religious beliefs or practices. *Id.* However, mere lack of expressed confidence or comfort with, or other generalized moral or philosophical "objection" to, the available vaccines are insufficient. *Id.* Exemptions are reviewed periodically by a health professional to determine whether the exemption shall remain in effect, and whether additional restrictions should apply. *Id.*

Students who are granted exemptions are permitted to attend class in person; use the library; visit offices on campus; use the dining facilities; participate in varsity athletics (with potential restrictions for team travel); and participate in club,

10

organization, recreation, cultural or campus activities that do not involve high contact with others and for which physical distancing is feasible and enforced by the group. TCNJ, "Fall 2021 Return to Campus: Health and Wellness," https://fall2021.tcnj.edu/health-and-wellness/. To ensure the health and safety of the campus community, however, they are subject to certain other requirements. *Id.* Specifically, they are not permitted to live in the residence halls or to participate in club, organization, recreation, cultural or campus activities that involve high contact with others and for which physical distancing is not feasible and enforced.[7] *Id*. They must (1) wear a mask and observe physical distance requirements while indoors on campus, (2) quarantine if they have been identified as a close contact of someone who has tested positive for the COVID-19 virus, even if they themselves have tested negative; and (3) receive periodic COVID-19 tests consistent with TCNJ's COVID-19 Testing Special Requirements. *Id.*

Exempt, unvaccinated students are required to be tested for COVID-19 approximately twice per week. *Id.* Also, individuals who report a positive test for COVID-19 may qualify for a temporary test exemption during the 90-day period following that positive test. *Id.* The COVID-19 tests are offered on campus at no

---

[7] This too is consistent with CDC guidance, which advises that "[d]ue to increased exhalation that occurs during physical activity, many sports put players, coaches, trainers, etc. who are not fully vaccinated at increased risk for getting and spreading COVID-19." Ex. 34. The CDC further advises that "[c]lose contact and indoor sports are particularly risky." *Id.*; *see, e.g.*, Ex. 47.

11

cost to students, provided that they submit health insurance information to the testing administrators. TCNJ, "Fall 2021 Return to Campus: On-Campus COVID-19 Testing Information and FAQs," https://fall2021.tcnj.edu/health-and-wellness/on-campus-covid-testing-information-and-faqs/. Students subject to mandatory periodic testing are also permitted, if they so choose, to submit COVID-19 test result from alternative testing providers. *Id.*

As of August 31, 2021, 97 percent of TCNJ's students had submitted proof of vaccination to the college, and the remaining 3 percent had been granted exemptions. TCNJ, Office of the President, "Welcome Home, Lions" (Aug. 31, 2021), https://president.tcnj.edu/2021/08/31/welcome-home-lions/.

### E. Plaintiffs' Complaint And Motion For Injunctive Relief.

On September 27, 2021, Plaintiffs—four students currently enrolled at TCNJ and one who has elected to defer enrollment for a semester—filed a Complaint against the Board of Trustees of TCNJ. Dkt. 1.

All five Plaintiffs were granted exemptions from the vaccine requirements under TCNJ's policy. Plaintiff Messina was granted a religious exemption for the Fall 2021 semester, but has refused to comply with TCNJ's testing requirement because, she attests, such testing "would induce severe anxiety and harm my mental and physical health." Dkt. 1-9 at ¶¶ 6, 9; *see also* Dkt. 1 at ¶ 45. She has elected to defer the Fall 2021 semester. Dkt. 1 at ¶ 46. The Complaint does not explain why

12

she chose to defer the semester instead of engaging in a fully web-based or online program. Dkt. 1-1, at 1 (explaining web-based/online exemption).

Similarly, Plaintiff Dieker was granted a religious exemption for the Fall 2021 semester; however, she attests that TCNJ's testing requirement "is a burden on me physically and mentally" because it is "inconvenient to fit into her schedule" and because she has experienced two nosebleeds following prior tests. Dkt. 1 ¶ 60. She also claims one professor told her that she would be working with "a group of three people so she could more easily segregate and physically distance from other students." Dkt. 1-10 at ¶¶ 13, 16-17; *see also* Dkt. 1 ¶¶ 54, 58-60. She further attests that she was not permitted to live on campus this semester;[8] and that she, though a captain of the club lacrosse team, is not allowed to "fully practice in the club" or "to travel with the team" due to the school's social distancing policies. *See* Dkt. 1-10 at ¶¶ 9, 11; *see also* Dkt. 1 ¶¶ 55-56.

Plaintiff Jacob was also granted a religious exemption for the Fall 2021 semester, and per the Complaint refuses to submit to testing. Dkt. 1 at ¶ 63. As a result, per the Complaint "[h]e is not able to participate with the [club soccer] team unless the e-board undertakes the onerous process of creating special drill practices,

---

[8] TCNJ only guarantees on-campus housing for freshmen and certain sophomores, as well as certain students such as residential advisors. *See* TCNJ, Residential Education and Housing, https://housing.tcnj.edu/living-on-campus/. There is no suggestion in the Complaint that Dieker falls into any of these categories.

13

submitting plans for the practices to the Sport Club Coordinator for approval, and notifying the Sport Club Coordinator each week as to types of practices scheduled that week." *Id.* at ¶ 64.

Plaintiff Zimberg was granted a medical exemption for the Fall 2021 semester, but nevertheless objects to regular testing because, she attests, fellow students check her in and, on one occasion, a student whom she knows administered the test, which she found "embarrassing." Dkt. 1-12 at ¶¶ 8, 11; Dkt. 1 at ¶¶ 68-70.

Plaintiff Walz was granted a religious exemption from the vaccine requirement for the fall semester. Dkt. 1-13 at ¶ 8; *see also* Dkt. 1 at ¶ 76. Because she recently recovered from COVID-19, she has also been extended a "testing exemption" for three months, pursuant to which she is not required to undergo testing until November 2021. Dkt. 1-13 at ¶¶ 8, 15; *see also* Dkt. 1 at ¶ 77.

This lawsuit was brought more than four months after TCNJ announced its vaccination requirement, seven weeks after students were required to either receive a first injunction or obtain an exemption, and a month after the start of classes.[9] Plaintiffs' Complaint alleges that TCNJ's policy (1) violates exempt students' due process rights by requiring them to submit to regular COVID-19 testing; (2) subjects exempt students to disparate treatment in violation of equal protection; and (3)

---

[9] Classes started on August 30, 2021. *See* TCNJ, "Academic Calendar: 2021-22," https://academics.tcnj.edu/academic-calendars/academic-calendar-2021-2022/ (last visited Oct. 4, 2021).

14

violates their rights to be free from unreasonable search and seizure under the Fourth Amendment. Dkt. 1 at ¶¶ 81-113.[10]

Plaintiffs simultaneously moved for a TRO and/or preliminary injunctive relief to enjoin TCNJ from enforcing its COVID-19 vaccination policy *in toto*, including any restrictions on unvaccinated students who received exemptions. Dkt. 2, 3. The Court ordered briefing on the TRO motion. Dkt. 5. This opposition follows.

## STANDARD FOR EMERGENCY INJUNCTIVE RELIEF

"[T]he grant of injunctive relief," courts have explained, "is an extraordinary remedy which should be granted only in limited circumstances." *Truck Ctr., Inc. v. Gen'l Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1998); *see also, e.g.*, *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000) (the "dramatic and drastic power of injunctive force may be unleashed only against conditions generating a presently existing actual threat"). "Such stays are rarely granted" in the Third Circuit because "the bar is set particularly high." *Conestoga Wood Specialties Corp. v. Sec. of U.S. Dep't of Health & Human Servs.*, No. 13-144, 2013 WL 1277419, *1 (3d Cir. Feb. 8, 2013). To grant emergency injunctive relief, the court must first determine whether these factors are met:

> (1) A likelihood of success on the merits; (2) that [the plaintiff] will suffer irreparable harm if the injunction is denied; (3) that granting

---

[10] Plaintiffs mention procedural due process one time in passing, *see* Dkt. 1 at ¶ 3, but do not provide any basis for the claim and do not make any arguments about the merits of the claim in their application for relief.

15

preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief.

*Kos Pharms. Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004).

The moving party always has the burden of "meet[ing] the threshold for the first two 'most critical' factors." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). And even if the moving party satisfies those first two tests, a court must still "consider[] the remaining two factors"—the balance of the equities and public interest—"and determine[] in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Kos Pharms*, 369 F.3d at 708. Finally, a party seeking emergency injunctive relief "that will alter the status quo bears a particularly heavy burden in demonstrating its necessity." *Lane v. New Jersey*, 725 F. App'x 185, 187 (3d Cir. 2018) (citation omitted).

## **ARGUMENT**

Plaintiffs' application for a TRO fails for two reasons: their lawsuit will ultimately not prevail on the merits, and the remaining equitable factors militate against granting the requested relief.

## I.   **PLAINTIFFS WILL NOT SUCCEED ON THE MERITS.**

Plaintiffs contend that TCNJ's vaccine policy violates their Fourteenth Amendment rights to substantive due process and equal protection, as well as their Fourth Amendment rights. Every court to consider similar challenges has rejected

them as meritless. This Court should find the same, and thus should deny the motion for a TRO.

### A.  TCNJ Has Sovereign Immunity And Is Not Subject To Plaintiffs' Suit.

Before even reaching the merits (or lack thereof) of Plaintiffs' constitutional claims, their suit ultimately will fail—eliminating any possibility of success on the merits—because TCNJ is an arm of the State of New Jersey and, as such, enjoys sovereign immunity.

With very specific, limited exceptions—none of which apply here—States enjoy sovereign immunity from suits in federal court pursuant to the Eleventh Amendment. *See, e.g.*, *Maliandi v. Montclair State Univ.*, 845 F.3d 77, 83 (3d Cir. 2016). And as an off-shoot of this immunity, the Supreme Court has unequivocally held that "States are not 'persons' within the meaning of § 1983 and, therefore, cannot be among those held liable for violations of the civil rights statute." *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 697 (3d Cir. 1995) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989)). Both of these principles extend to "arms of the State," such as State departments and agencies. *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997); *Will*, 491 U.S. at 70.

"[T]o determine whether an entity is an arm of the [S]tate," the Third Circuit applies a "three-part test" first adopted in *Fitchik v. N.J. Transit Rail Operations, Inc.*, 873 F.2d 655, 659 (3d Cir. 1989):

17

(1) whether the payment of the judgment would come from the state;
(2) what status the entity has under state law; and
(3) what degree of autonomy the entity has.

Following the Supreme Court's decision in *Doe*, 519 U.S. at 425, the Third Circuit clarified that all three "*Fitchik* factors" carry the same weight and are to be considered as "co-equal[s]" when conducting the analysis. *Benn v. First Judicial Dist. of Pa.*, 426 F.3d 233, 240 (3d Cir. 2005).

Based on this analysis, the law of this Circuit makes clear that all New Jersey state colleges are considered arms of the State. In *Maliandi*, the Third Circuit set out to "synthesize our jurisprudence regarding the *Fitchik* factors for the benefit of district courts in future Eleventh Amendment cases." *Id.* at 86. First, it recognized that other circuits "have almost uniformly concluded that state-affiliated universities are arms of their respective States," and that "the factors relevant to an Eleventh Amendment inquiry typically favor immunity in the state college setting." *Maliandi*, 845 F.3d at 85 (collecting cases). It applied the *Fitchik* factors to another New Jersey State college, Montclair State University, and concluded that because factors 2 and 3—the status and autonomy factors—favored a finding that Montclair was an arm of the State, it was therefore entitled to Eleventh Amendment immunity, and not subject to suit over § 1983 claims.

The Third Circuit confirmed that state colleges are arms of the state for Eleventh Amendment purposes in *Jones v. Pi Kappa Alpha Int'l Fraternity, Inc.*,

18

765 Fed. Appx. 802 (3d Cir. 2019). The court found that because Ramapo College of New Jersey also "is a New Jersey state college governed by the same statutes that governed Montclair, we are compelled by *Maliandi* to conclude that Ramapo is an arm of the state under the *Fitchik* factors." *Id.* at 807. It noted that Ramapo's status under state law is identical to Montclair's, and therefore the second *Fitchik* factor supported that the State college was an arm of the State. *Id.* at 807-08. And because the same statutory requirements that supported Montclair's lack of autonomy from the State applies in equal force to all other State colleges, including Ramapo, the third *Fitchik* factor also supported immunity to Ramapo. *Id.* at 808.[11] *See also Gonzalez v. N.J. Dep't of Children & Families*, No. 14-7932, 2021 WL 2621743, *30-31 (D.N.J. June 25, 2021) (confirming that Kean University and a subentity within Kean are arms of the State).

Maliandi* and *Jones* compel the conclusion here that TCNJ, another State college, is an arm of the State. TCNJ shares the same indicia with Montclair, Ramapo, and Kean that led the courts to conclude that the "status under state law" factor (the second *Fitchik* factor) supports that State colleges are part of the State of New Jersey. *See Jones*, 765 Fed. Appx. at 807-08; *Maliandi*, 845 F.3d at 91-96. *See*

---

[11] Notably, *Maliandi* and *Jones* both were appeals of Rule 12 motions to dismiss, and thus decided (and immunity granted) based simply on the pleadings, as opposed to a fully developed evidentiary record. *See Jones*, 765 Fed. Appx. at 805-06; *Maliandi*, 845 F.3d at 82.

19

*generally* N.J. Stat. Ann. §§ 18A:64-1 to -84, 18A:3B-1 to -36. And TCNJ is subject to the same statutory structure, *see id.*, that indicates it, like all State colleges, lacks independence from the State (the third *Fitchik* factor). *See Jones*, 765 Fed. Appx. at 808 (citing to these statutes); *Maliandi*, 845 F.3d at 97-98 (same).[12]

Plaintiffs thus not only lack any likelihood, but have *no possibility* of success as to any of their claims. Defendants are immune from suit in this Court. In addition, and separately, defendants are not "persons" subject to suit over the § 1983 constitutional claims that Plaintiffs are advancing. *See Will*, 491 U.S. at 70. For these reasons alone, this Court must deny Plaintiffs' motion.

**B.  TCNJ's Policy Does Not Violate The Constitution.**

Even if the Court turned to the merits of Plaintiffs' claims, the application for injunctive relief still must be denied because none of the claims have merit.

---

[12] Plaintiffs correctly treat TCNJ and its Board of Trustees as one and the same for purposes of this lawsuit. *See, e.g.*, Dkt. 1 at p. 1 ("Plaintiffs … complain against Defendant The Board of Trustees of the College of New Jersey"); *id.* at ¶ 8 (alleging the Board of Trustees "is the governing body of [TCNJ]," and "the State of New Jersey has delegated the 'government, conduct, management and administration' of TCNJ to the Board" (citing N.J. Stat. Ann. § 18A:64-2)). But to whatever extent Plaintiffs' pleadings could be read as treating TCNJ and its Board as separate defendants, both are equally regarded as arms of the State for the reasons presented above. *See also, e.g.*, *Jones*, 765 Fed. Appx. at 80 (finding *Fitchik* factors 2 and 3 supported immunity for State college based on the various statutory powers, and duties, the State imposes on its governing body, the board of trustees).

### 1. The Challenge To The Vaccine Requirement

As an initial matter, Plaintiffs lack Article III standing to challenge to TCNJ's vaccine requirement itself. Although Plaintiffs devote the vast majority of their TRO briefing to the vaccine requirement, each of the five plaintiffs already received exemptions from the requirement.[13] They thus have no injury-in-fact—that is, "a concrete and particularized legally protected interest resulting in harm that is actual or imminent, not conjectural or hypothetical." *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 272 (3d Cir. 2016) (internal quotation marks omitted). Their mere disagreement with the vaccine requirement does not confer standing on them. *See, e.g.*, *Ariz. Christian Sc. Tuition Org. v. Winn*, 563 U.S. 125, 140, 145-46 (2011). Nor does the mere fact that TCNJ has a policy of periodic reviews of exemptions by health professionals confer standing, as that at best provides only a "conjectural or hypothetical" claim. *Nickelodeon*, 827 F.3d at 272. "Allegations of possible future injury are not sufficient to satisfy Article III." *Reilly v. Ceridian Corp.*, 664 F.3d 38, 42 (3d Cir. 2011) (internal citations omitted). Because Plaintiffs have pled no facts suggesting concrete and imminent imposition of the vaccine requirement, they cannot bring a claim on this basis. *See, e.g.*, *Wade v. Univ. of Conn. Bd. of Trustees*, No. 21-924, 2021 WL 3616035, *7-8 (D. Conn. Aug. 16, 2021) (holding students

---

[13] Plaintiffs Messina, Dieker, Jacob, and Walz all obtained religious exemptions, and Plaintiff Zimberg obtained a medical exemption. Dkt. 1 at ¶¶ 45, 54, 63, 68, 76.

who received exemption from college's vaccine requirement lacked standing to challenge the requirement itself; and, that their prior raised challenges were moot, notwithstanding the "speculative" possibility of future revocation of the exemption); *Shelton v. City of Springfield*, No. 20-3258, 2020 WL 6323935 (W.D. Mo. Oct. 28, 2020) (holding plaintiff has no standing to bring suit based on fear that her medical exemption to COVID-19 mask mandate will not be accepted); *Bechade v. Baker*, No. 20-11122, 2020 WL 5665554 (D. Mass. Sept. 23, 2020) (same).

Even if Plaintiffs have standing, they acknowledge that *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) forecloses any constitutional challenge. Dkt. 2-1, at 8 (acknowledging that vaccines are an "exception" to their claims of substantive due process). Their efforts to distinguish this case are futile.

To begin, as courts reviewing similar college COVID-19 vaccine mandates have uniformly concluded, *Jacobson* controls. In *Jacobson*, the Supreme Court upheld a Cambridge, Massachusetts regulation that all adults must be vaccinated against smallpox, without exemption, on penalty of criminal conviction. 197 U.S. at 13. The Court rejected a constitutional challenge to the rule, holding that "[i]t is not … true that the power of the public to guard itself against imminent danger depends in every case involving the control of one's body upon his willingness to submit to reasonable regulations established by the constituted authorities, under the sanction of the state, for the purpose of protecting the public collectively against such

22

danger." *Id.* at 29-30. Thus, the Seventh Circuit held, "there can't be a constitutional problem with vaccination against SARS-CoV-2." *Klaassen v. Trustees of Ind. Univ.*, 7 F.4th 592, 593 (7th Cir. 2021). Other courts, including this one, have held the same. *See, e.g.*, *Children's Health Defense v. Rutgers*, No. 21-15333, 2021 WL 4398743, *5-6 (D.N.J. Sept. 27, 2021); *Kheriaty v. Regents of the Univ. of Cal.*, No. 21-1367, Dkt. 39, at 7 (C.D. Cal. Sept. 29, 2021); *Norris v. Stanley*, No. 21-756, 2021 WL 3891615 (W.D. Mich. Aug. 31, 2021); *Harris v. Univ. of Mass., Lowell*, No. 21-11244, 2021 WL 3848012, *8 (D. Mass. Aug. 27, 2021).

Nothing in Plaintiffs' submission here suggests a different result. Plaintiffs' main argument is the facially untenable assertion that COVID-19 vaccines are not actually vaccines, but rather "gene therapy products." For one, Plaintiffs cite no medical authority for the proposition that the three FDA-authorized COVID-19 vaccines are *not* vaccines. As discussed above, *supra* at 5-6, n. 3, the assertion that the vaccines are "gene therapy products" is patently false.[14] To be clear, federal health agencies, including the FDA, which is tasked with authorization and approval of vaccines, deem these products to be vaccines. *See, e.g.*, Ex. 51 ("The FDA has regulatory processes in place to facilitate the development of COVID-19 vaccines that meet the [FDA's] rigorous scientific standards."); Exs. 29, 52-53. In fact, the

---

[14] And Plaintiffs also fail to cite any authority—scientific or otherwise—for why even if their assertions about "gene therapy products" were true, the products could not *also* be a vaccine.

23

Pfizer vaccine appears on the same FDA list of licensed vaccines that also includes the smallpox vaccine. Ex. 54. Plaintiffs' own documents confirm these products are vaccines. *See* Dkt. 1-6; 1-7; 1-8. And there is simply no basis for arguing that because the medical technology for creating a vaccine is different than in the past— and indeed, the advance of medicine makes such the case frequently—there is a constitutional right to refuse the vaccine.

Plaintiffs' other arguments are squarely foreclosed by *Jacobson*. For example, they attempt to cast doubt on the efficacy of the COVID-19 vaccines and complain of the risks and side effects they ascribe to the vaccines.[15] But as the *Jacobson* Court already rejected this line of argument. For one, it made clear that "[i]t is no part of the function of a court or a jury to determine which one of two modes was likely to be the most effective for the protection of the public against disease." 197 U.S. at 30. For another, it expressly rejected essentially identical arguments, explaining that while it is "not possible in any case to determine whether vaccination is safe" with certainty, and that accepting these arguments "would mean that compulsory

---

[15] Moreover, CDC guidance explains that the COVID-19 vaccines are safe and effective. "COVID-19 vaccines were evaluated in tens of thousands of participants in clinical trials. The vaccines met the [FDA's] rigorous scientific standards for safety, effectiveness, and manufacturing quality needed to support approval or authorization of a vaccine." Ex. 48. As one court has put it, it is "dumbfound[ing]" to even engage in this discussion, as "real data show that these vaccines, like so many others before, are generally safe and effective," and "this is a tremendous victory for humanity." *Streight v. Pritzker*, No. 21-50339, 2021 WL 4306146, *17-18 (N.D. Ill. Sept. 22, 2021).

vaccination could not, in any conceivable case, be legally enforced in a community … however widespread the epidemic of smallpox, and however deep and universal was the belief of the community and of its medical advisers that a system of general vaccination was vital to the safety of all." *Id.* at 37. That, the Court confirmed, was an untenable result. *Id.*

The same applies here. After all, colleges and universities have long required numerous vaccinations as a prerequisite for attendance and communal living in dorms, including for vaccinations for meningococcal disease; measles, mumps, and rubella; tetanus, diptheria, and pertussis; and Hepatitis B. *See* TCNJ, "Pre-Entrance Health Requirement Packet, First Year and Transfer Students," https://health.tcnj.edu/wp-content/uploads/sites/129/2020/05/PEHR-Packet-2020-Undergrad.pdf. But by arguing they have a constitutional right to refuse the COVID-19 vaccine, Plaintiffs would also excise these longstanding, basic requirements that exist across the country. Luckily, *Jacobson* has already rejected such a contention. As the Court explained: "We are unwilling to hold it to be an element in the liberty secured by the Constitution of the United States that one person, or a minority of persons, residing in any community and enjoying the benefits of its local government, should have the power thus to dominate the majority when supported in their action by the authority of the state." *Id.* at 38. That is aptly fitting here. If TCNJ and other schools were powerless to adopt basic immunization measures, it

25

would be unable to ensure its very ability to operate in a safe setting and provide educational services at all.

Plaintiffs, without the support of any authority, also argue that because TCNJ's vaccine mandate is "bureaucratic" as opposed to "legislative," the vaccine rules must be viewed under strict scrutiny analysis. But there is no basis in law for subjecting an identical rule to different levels of scrutiny based on whether the rule is promulgated by a legislature or an agency. Indeed, in *Jacobson*, the specific smallpox vaccine regulation at issue was adopted by the Cambridge board of health—a regulatory body—pursuant to a general statute that dealt with vaccination. 197 U.S. at 12. Here, the Legislature passed a general statute that requires colleges and universities in New Jersey to mandate vaccinations. N.J. Stat. Ann. § 18A:61D-1. And under state health regulations, those institutions may "establish additional requirements for student immunizations and documentation that such institution shall determine appropriate and which is recommended by the ACIP." N.J. Admin. Code § 8:57-6.4. This scheme is no different from the one upheld in *Jacobson*. Put simply, whether TCNJ's vaccine mandate was the result of a statute, executive order, or college policy is simply not relevant to the constitutional analysis.

Thus, given that TCNJ's requirement is only subject to a rational basis standard, *see Klaassen*, 7 F.4th at 593; *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 70 (2020) (Gorsuch, J., concurring) ("Although *Jacobson* pre-

dated the modern tiers of scrutiny, this Court essentially applied rational basis review ….”), none of Plaintiffs’ other arguments, many of which are not based in factual evidence, withstand muster. For example, Plaintiffs’ argument that because TCNJ’s mandate does not account for students who have contracted the virus and thus developed “natural immunity” is no basis for relief. For one, as Plaintiffs confirmed, the College *does* consider recent infection in its policy. *See* Dkt. 1, at ¶¶ 78-79 (describing Walz’s exemption from testing for three months after she contracted COVID-19). And Plaintiffs themselves have proffered no evidence as to the actual effectiveness or duration of any particular individual’s “natural immunity.” *See, e.g.*, Dkt. 1-11, ¶ 16 (Plaintiff Jacob asserting only that, “I *believe* [I] am already immune to Covid-19”) (emphasis added)). The College’s policy is a rational way to ensure public health protection for the campus community. *See Kheriaty*, Dkt. 39, at 10.

Finally, Plaintiffs overemphasize the efficacy of natural immunity; a recent study found that vaccines are approximately 2.34 times more effective against COVID-19 than natural immunity. Ex. 23. And CDC Director Dr. Rochelle Walensky has unequivocally stated: “If you have had COVID-19 before, please still get vaccinated…. Getting the vaccine is the best way to protect yourself and others around you, especially as the more contagious Delta variant spreads around the country.” Ex. 49. Indeed, by Plaintiffs’ own admission, natural immunity wanes over time, and it is unclear whether and when any of Plaintiffs contracted the virus, but

27

certain that eight months will lapse before the end of the school year. In any event, TCNJ's policy of ensuring *effective* protection against COVID-19 through vaccination and following CDC guidance more easily meets rational-basis review.

### 2. Claims Against Testing And Social Distancing Rules

Plaintiffs' next argument—that after receiving an exemption from vaccination, they have a right against being regularly tested for the virus and subject to social-distancing rules—is weaker still. Their only support for the right not to be tested for a contagious, deadly disease is that "[t]esting for Covid-19 is a medical procedure that implicates fundamental liberty and privacy interests," and offer no precedent or other support. Dkt. 2-1, at 38. This is plainly incorrect. As a threshold matter, these challenged rules apply to Plaintiffs because they have already *opted out* of and obtained an exemption from vaccination. But the fact that Plaintiffs could have chosen vaccination—which is constitutional even without exemptions, as in *Jacobson*—forecloses any argument that their choice to forgo vaccination violates their constitutional rights. *See, e.g.*, *Klaassen*, 7 F.4th at 593 (noting "this case is easier than *Jacobson*" for the University of Indiana, which also had medical and religious exemption options); *Children's Health Defense*, 2021 WL 4398743, *5 ("The statute in *Jacobson* was even more stringent than [the college's policy]," because, among other things, the policy provides exemptions to vaccination); *Harris*, 2021 WL 3848012, at *6 ("Requirement here poses even fewer

28

constitutional concerns than in *Jacobson* … as students may seek exemptions, opt to take online classes or defer their enrollment for the semester.").

Moreover, given that *Jacobson* holds that a mandatory injection to prevent the spread of deadly disease does not run afoul of the Constitution, a lesser intrusion in the form of a nasal swab is even less problematic. After all, if communities must have the ability to "legally enforce" compulsory vaccination because such a system is "vital to the safety of all," *Jacobson*, 197 U.S. at 37, the same applies to regular testing to detect a potentially deadly, airborne disease during a once-in-a-lifetime pandemic. And while Plaintiffs characterize the requirement of being tested and required to socially distance as "a massive intrusion," Dkt. 2-1, at 21, there is simply no support in law for the proposition that routine testing for an airborne, contagious disease during a pandemic violates substantive due process. For one, Plaintiffs cannot establish that the purported right to refuse being tested for contagious illnesses during a deadly pandemic is based in any "concrete examples involving fundamental rights found to be deeply rooted in our legal tradition," a prerequisite for substantive due process claims. *Washington v. Glucksberg*, 521 U.S. 702, 722 (1997). Indeed, the longstanding norms confirmed by Jacobson indicate the very opposite. *Id.* at 742 (Stevens, J., concurring) ("In most cases, the individual's constitutionally protected interest in his or her own physical autonomy, including

29

the right to refuse unwanted medical treatment, will give way to the State's interest in preserving human life.").[16]

And even if Plaintiffs could make out a substantive due process claim with respect to the testing and social distancing requirements, they ignore the simple fact that they could choose not to be subject to any of TCNJ's rules at all. Indeed, there is no fundamental right to attend this particular college. *See Klaassen v. Trustees of Ind. Univ.*, No. 21-238, 2021 WL 3073926, \*22 (N.D. Ind. July 18, 2021) (citing cases); *Norris*, 2021 WL 3891615 (adopting *Klaassen* analysis and finding that the constitution permits colleges to protect public health of students, faculty, and staff); *Children's Health Defense*, 2021 WL 4398743 (same). When Plaintiffs chose to enroll at TCNJ, they "voluntarily trade[d] away some of [their] privacy for other goods," namely a college education. *Dimeo v. Griffin*, 943 F.2d 679, 682 (7th Cir. 1991). That is why, as the Seventh Circuit observed, "[i]f conditions of higher

---

[16] Nor does the requirement to submit a nasal swab, which the students can obtain at TCNJ for free, and upload the test results to an online portal, violate the student's legitimate expectations of privacy. Plaintiffs have not identified any privacy interest that would be intruded as a result of the testing requirement. For example, their objection to other students' assistance in administering the test fails to explain why there is any violation of privacy. And there is nothing in TCNJ's policy that *requires* Plaintiffs to get their testing done on campus, as they may simply get tested at a provider of their choice at their own expense. *See supra* at 12-13. Finally, although TCNJ need only comply with FERPA as to its students' personal health records, TCNJ's online portal, connected to third-party IT provider Medicat, is also HIPAA-compliant. *See* Medicat, "Medicat Security & Reliability," available at https://medicat.com/security/ (last visited Oct. 4, 2021).

30

education may include surrendering property and following instructions about what to read and write, it is hard to see a greater problem with medical conditions that help all students remain safe when learning." *Klaassen*, 7 F.4th at 594. If Plaintiffs do not wish to be subject to TCNJ's rules, they are free to withdraw. That removes their claims from the ambit of substantive due process entirely.

Finally, any potential concern about substantive due process is overcome when considering the exceptional nature and immediacy of the government concern—namely stemming the spread of COVID-19. *See*, *e.g.*, *Children's Health Defense*, 2021 WL 4398743, *23 (finding a "strong public interest" against granting injunctive relief from the University's vaccination requirements); *Streight*, 2021 WL 4306146, *13 ("The nature and immediacy of the government concern here is great."). TCNJ's justifications for the testing requirement is robust and clearly passes rational basis review and even higher levels of scrutiny. The testing requirement is an effective mechanism to ensure early detection of COVID-19 cases in the campus community. Indeed, the CDC has recommended that campuses implement regular testing requirements to control the spread of the virus. *See, e.g.*, Exs. 30, 34. Without it, colleges such as TCNJ would be unable to protect its students and staff— including those more vulnerable due to age or other conditions—by taking precautionary measures and containing spread.

31

### 3. The Equal Protection And Fourth Amendment Claims

Plaintiffs' TRO briefing fails to substantively address the equal protection and Fourth Amendment claims. Indeed, those claims are meritless. As for the former, vaccination status is not a suspect class, and therefore any equal protection claim is only subject to rational basis review. *See, e.g.*, *Norwegian Cruise Lines Holdings, Ltd. v. Rivkees*, No. 21-22492, 2021 WL 3471585, at *14 (S.D. Fla. Aug. 8, 2021) ("[T]he unvaccinated population is not a protected class that enjoys a fundamental Constitutional right to remain unvaccinated."); *Kheriaty*, Dkt. 39 at 10-11 (same).

TCNJ's policy for unvaccinated students clearly bears "a rational relation to some legitimate end," *Valdez v. Grisham*, No. 21-783, 2021 WL 4145746, *9 (D.N.M. Sept. 13, 2021), because its testing and social distancing requirements are rationally related to the government interest in preventing COVID-19 spread and negative health effects for students and the community. As this Court and others have held, an equal protection challenge to a college vaccination policy should fail because the requirement to obtain a vaccination or abide by alternative requirements is rationally related to the government's legitimate interest in stemming the spread of COVID-19. *See Children's Health Defense.*, 2021 WL 4398743, *23; *Harris*, 2021 WL 3848012; *Klaassen*, 2021 WL 3073926, *2. The risk of outbreaks of COVID-19 are particularly concerning in college settings where individuals congregate in high numbers, *see, e.g.*, Ex. 30; *supra* at 7, and transmission between

32

unvaccinated persons remains the primary cause of continued spread of COVID-19, *see, e.g.*, Exs. 9, 23-28, 50; *supra* at 4-5, 8. Therefore, to accommodate students who are unvaccinated on campus while seeking to stop the spread of COVID-19, TCNJ has instituted reasonable policies to test and socially distance unvaccinated students. TCNJ's policy is based "upon both medical and scientific evidence and research and guidance, and thus rationally related" to the legitimate interests of protecting its community against COVID-19. *Harris*, 2021 WL 3848012, at *18.

Finally, Plaintiffs' Fourth Amendment claim fails on its face. Testing requirements during a pandemic for unvaccinated students do not constitute an unreasonable search. As a threshold matter, as discussed above, *see* supra at XX, Plaintiffs' constitutional claims lacks merit because Plaintiffs opted to be subject to TCNJ's requirements for unvaccinated students: they chose to attend TCNJ in-person and they sought and obtained exemptions from vaccination. In other words, Plaintiffs have "alternatives available to avoid testing—namely, vaccination or enrollment in online course," as well as "the ultimate alternative: attend a college that does not impose a testing requirement." *Streight*, 2021 WL 4306146, at *6; *see also Klaassen*, 7 F.4th at 593 ("People who do not want to be vaccinated [or tested] may go elsewhere…. Plaintiffs have ample educational opportunities.").

But even putting aside the alternatives, TCNJ's policy of biweekly testing for unvaccinated students easily meets Fourth Amendment standards because of the

33

special needs of protecting the campus and the broader community from COVID-19 outbreaks. *See Streight*, 2021 WL 4306146, *4-8 (rejecting Fourth Amendment challenge to COVID-19 testing policy); *Aviles v. Blasio*, 2021 WL 796033, at *24 (S.D.N.Y. Mar. 2, 2021) (same). That is why the Supreme Court has upheld suspicionless searches and seizures in a variety of contexts by "balancing [any] intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Veronia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653-54 (1995). Those situations include drug testing policies for student athletes, "drug testing of railroad personnel involved in train accidents," "random drug testing of federal customs officers who carry arms or are involved in drug interdiction," and "to maintain automobile checkpoints looking for illegal immigrants and contraband … and drunk drivers." *Id*. at 653-54.

TCNJ's testing policy for unvaccinated students easily meets that balancing test. After all, the testing requirement—a nasal swab that takes seconds—is not a significant intrusion on Plaintiffs' privacy interests. *See Streight*, 2021 WL 4306146, *6 ("[T]he requirement for weekly, no-cost, saliva-based testing is also negligible."); *Aviles*, 2021 WL 796033, at *22 (concluding that the privacy intrusion from COVID-19 nasal swab testing "is minimal in nature"). Moreover, the testing policy takes place in a context where legitimate expectations of privacy are lower. While college students do not shed their rights at the proverbial schoolhouse gate, "Fourth

34

Amendment rights … are different in public schools than elsewhere," especially during a pandemic. *Vernonia*, 515 U.S. at 656 (citing vaccination requirements as example for why "students within the school environment have a lesser expectation of privacy than members of the population generally"). On the other end of the balancing scale, "[t]he nature and immediacy of the government concern here is great." *Streight*, 2021 WL 4306146, *6. As described above, TCNJ's policy advances legitimate government interests. It is based on medical and scientific evidence and guidance from government health agencies to minimize the risk of the virus spreading to others on campus and in the community. It is also a policy designed to *allow* the very exemptions that Plaintiffs have received from vaccination, while also seeking to stop viral spread and its consequences. Thus, when balancing such strong government interests against minimal intrusions into a college student's privacy interests in a context where legitimate expectations of privacy are already diminished, it is clear that Plaintiffs' Fourth Amendment claims have no likelihood of success on the merits.

## II.   THE REMAINING FACTORS MILITATE AGAINST GRANTING EMERGENCY INJUNCTIVE RELIEF.

Even beyond the fact that Plaintiffs' claims will not prevail on the merits—which is fatal to their application for an injunction—Plaintiffs cannot demonstrate that the remaining factors cut in their favor. As a threshold matter, Plaintiffs cannot demonstrate any irreparable harm from the vaccine-or-exemption policy. To begin,

35

none of them have, or are being forced to, receive the vaccine. Instead, aside from voicing general philosophical disagreement with the vaccines and vaccine mandates, they assert that because they remain unvaccinated they will experience small levels of separation or judgment from their fellow students or professors. *See supra* at 13-16. Four of the Plaintiffs also assert the free regular testing presents an undue burden. *See id*. These minimal inconveniences fall utterly short of the level required to constitute irreparable harm, as other courts have found. *See, e.g.*, *Streight*, 2021 WL 43016146, *2 n.4 (citing *Klaassen*, 2021 WL 3073926, *41-42); *Harris*, 2021 WL 3848012, *8. And Plaintiff Walz, by her own assertions, apparently faces no conditions at this time that she suggests presents any harm to her, let alone irreparable harm. *See supra* at 15.

But more fundamentally, the fact that Plaintiffs waited over four months to request relief wholly undermines their claims of irreparable harm. TCNJ first announced its vaccination requirement on May 7, 2021, but Plaintiffs did not file a complaint and seek injunctive relief until September 27—a month after the start of the semester, and seven weeks after the deadline to either receive a first dose of the vaccine or obtain an exemption. *See supra* at 13. It is black letter law that delay can "knock[] the bottom out of any claim of immediate and irreparable harm," and is a "dispositive basis" for rejecting an application for an emergency injunction. *Pharmacia Corp. v. Alcon Labs.,* 201 F. Supp. 2d 335, 382 (D.N.J. 2002); *see also*

36

*Children's Health Defense*, 2021 WL 4398743, \*7 (finding lack of irreparable harm even though the plaintiffs, *unlike* Plaintiffs here, at least had finally sought relief before the semester began); *Doris Behr 2012 Irrevocable Trust v. Johnson & Johnson*, No. 19-8828, 2019 WL 1519026, \*4 (D.N.J. Apr. 8, 2019) (noting "delay in filing" for relief "undermines" claims for irreparable harm). After all, emergency "injunctions are generally under the theory that there is an urgent need for speedy action to protect plaintiffs' rights," but plaintiffs' own decision to delay "seeking enforcement of those rights" indicates that there is little urgency. *Lanin v. Borough of Tenafly*, 515 Fed. App'x. 114, 2013 WL 936363 (3d Cir. 2013) (quoting *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (finding no irreparable harm where party waited ten weeks to seek an injunction)); *see also Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) ("[O]ur sister circuits … have found that a party's failure to act with speed or urgency in moving for a preliminary injunction necessarily undermines a finding of irreparable harm.").

That Plaintiffs have voluntarily delayed their filing means that they face an additional insurmountable hurdle for injunctive relief. The point of a TRO is typically to *preserve* the state of affairs while the parties litigate, and such delays increase the risk that relief would "fundamentally alter[] the status quo." *Acierno v. New Castle Cty.*, 40 F.3d 645, 647 (3d Cir. 1994). TCNJ's challenged policy designed to protect student and public health is the status quo and has been for many

37

months. Plaintiffs could have moved for relief "several months and weeks before the semester began" but chose not to, and the harm resulting from this is "self-inflicted," rather than irreparable. *Children's Health Defense*, 2021 WL 4398743, *7.

On the other side of the ledger, Defendants would face considerable harm from the grant of an injunction—indicating that both the balance of equities and the public interest militate against relief. *See, e.g.*, *W.S. by Sonderman v. Ragsdale*, No. 21-1560, 2021 WL 2024687, *3 (N.D. Ga. May 12, 2021) (noting that these "factors merge when, as in this case, the government is the opposing party"). Generally, the State and its residents suffer irreparable harm anytime that the State is enjoined from enforcing its policies. *See, e.g.*, *Maryland v. King*, 567 U.S. 1301, 1301 (2012) (Roberts, C.J., in chambers). But the harm from upending a law relating to COVID-19 is especially profound; "it is no exaggeration to recognize that the stakes for residents of the [State] are life-or-death." *Tolle v. Northam*, No. 20-363, 2020 WL 1955281, *1 (E.D. Va. Apr. 8, 2020). As the Third Circuit noted, the pandemic has had devastating consequences, but at the same time "society has learned more about how COVID-19 spreads," and "vaccines have been manufactured and distributed"— which has and will continue to save countless lives. *Butler*, 8 F.4th at 230. To prevent TCNJ from using that knowledge and to undermine the few limited restrictions it is maintaining would be akin to "throwing away your umbrella in a rainstorm because you are not getting wet." *Cassell v. Snyders*, 458 F. Supp. 3d 981, 994 (N.D. Ill.

38

2020) (quoting *Shelby Cty. v. Holder*, 570 U.S. 529, 590 (2013) (Ginsburg, J., dissenting)); *see also Cty. of Butler v. Gov. of Pa.*, 8 F.4th 226, 234 (3d Cir. 2021) (Jordan, J., concurring) (noting the country is "not through with COVID"). That is contrary to the public interest.

Enjoining TCNJ's policy would incur especially harrowing harms because the policy addresses risks to all of its students and staff, as well as the community at large. As the real-world evidence described *supra* at 9-10 demonstrates, absence of vaccine mandates already has led to widespread COVID-19 outbreaks on campuses this semester. Such outbreaks can pose significant consequences for members of the campus community who are especially vulnerable to the virus. As this Court found, "given that many students around campuses are returning to in-person classes this semester … thousands of students may possibly be at risk" should the Court grant injunctive relief. *Children's Health Defense*, 2021 WL 4398743, *7. Moreover, such outbreaks also have the potential to spread to the broader community.[17] Finally, failure to protect against further spread could result in disruption of education of all students at TCNJ due to a need to resume fully virtual classes—a result that sadly has already occurred in other colleges around the nation. *See supra* at 9-10.

---

[17] Plaintiffs' arguments that the mortality rate of COVID-19 does not support TCNJ policies callously ignores the transmissibility of COVID-19. *See supra* Exs. 9-16; *supra* at 4-5, 9-10. After all, the virus has already resulted in the deaths of 700,000 individuals in the United States, and the Delta Variant's particular virulence poses a current and significant risk.

In light of the risks, Defendants "have a right to rely on the recommendations given by reputable public health authorities, such as the [CDC], when deciding how to combat COVID-19, which has caused the worst public health crisis in a century." *Sonderman*, 2021 WL 2024687, *3. While Plaintiffs disagree with those assessments, "it is not in the best interest of the public to interfere with that guidance." *Id.* Rather, "[e]nabling [TCNJ] to work through these problems reasonably fosters public health and safety in areas of scientific uncertainty. *Children's Health Defense*, 2021 WL 4398743, *7 (quoting *Klaassen*, 2021 WL 3073926, *43); *see*, *e.g.*, *Harris*, 2021 WL 3848012, *8. This Court should instead allow TCNJ to continue with its measured response—pairing vaccinations with certain additional social-distancing and testing requirements for the unvaccinated— just as the Constitution authorizes it to do.

## **CONCLUSION**

This Court should deny Plaintiffs' Motion for Injunctive Relief.

Respectfully submitted,

ANDREW J. BRUCK
ACTING ATTORNEY GENERAL OF
NEW JERSEY

By:    /s/ Daniel M. Vannella
Daniel M. Vannella (015922007)
Assistant Attorney General

Dated: October 4, 2021